Noel C. Crowley (#3712)
CROWLEY & CROWLEY
20 N. Park Place, Suite 206
Morristown, New Jersey 07960
(973) 829-0550
Attorneys for defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
_____
                             x
ASTA FUNDING, INC.,          : Civil Action No. 2:11-cv-02202-KM-MAH
                             :
          Plaintiff,         :
                             :
          vs.                :
                             :
YOUR WELLBEING, LLC;         :
CHARLES RONALD GREEN         : Return date:  May 6, 2013
JR.; and MELINDA GREEN,      :
                             : ORAL ARGUMENT REQUESTED
          Defendants.        :
_____x
```

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ......................................ii

PRELIMINARY STATEMENT .....................................1

POINT I:      ASTA'S CLAIM TO HAVE BEEN
              DEFRAUDED IS BELIED BY
              UNCONTROVERTED EVIDENCE THAT
              (1) ITS OWN AGENT WAS RESPONSIBLE
              FOR THE COMPOSITION OF WHAT IT
              MISTAKENLY CONTENDS WERE FALSE
              STATEMENTS OF EXISTING FACT, AND
              (2) THAT SAID AGENT'S KNOWLEDGE OF
              THE STATUS OF YWB'S CLIENT
              ENROLLMENT EFFORT IS IMPUTED TO
              ASTA ITSELF. .............................2

POINT II:     PLAINTIFF'S CLAIM THAT DEFENDANTS
              HAD A PRECONCEIVED INTENTION NOT TO
              PERFORM THEIR CONTRACTUAL OBLIGATIONS
              IS CONTRARY TO THE FACTUAL RECORD OF
              YWB'S ACTIONS AND CONDUCT. ..............11

POINT III:    ASTA'S CLAIM TO HAVE RELIED ON
              CLIENT SCHEDULES IS NOT CONSISTENT
              WITH ITS STATED REASONS FOR
              WITHDRAWING FROM THE YWB VENTURE. ........16

POINT IV:     THE LOSSES ASTA SUSTAINED BY
              EXERCISING ITS OPTION TO ABANDON
              THE PROJECT ARE NOT RECOVERABLE AS
              LEGAL DAMAGES. ..........................19

CONCLUSION ...............................................28

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Alexander v. CIGNA Corp.,
        991 F. Supp. 427 (D.N.J. 1998) .........................11

Anderson v. Modica,
        4 N.J. 383 (1950) ......................................11

Bell Atlantic Network Services, Inc. v.
P.M. Video Corp.,
        322 N.J. Super. 74 (App. Div. 1999) ...................28

City v. Millville v. Rock,
        683 F. Supp. 2d 319 (D.N.J. 2010) .....................18

Dean v. Barrett Homes, Inc.,
        406 N.J. Super. 453 (App. Div. 2009) ..................17

Handleman v. Cox,
        39 N.J. 95 (1963) ......................................10

Lightning Lube, Inc. v. Witco Corp.,
        4 F.3d 1153 (3d Cir. 1993) .........................12, 13

Marrone v. Greer & Pohlman Construction, Inc.,
        405 N.J. Super. 288 (App. Div. 2009 )..................18

Notch View Associates v. Smith,
        260 N.J. Super. 190 (Law Div. 1992) ...............12, 13

Ocean Cape Hotel Corp. v. Masefield Corp.,
        63 N.J. Super. 369 (App. Div. 1960) ........11, 12, 13, 14

Pfenninger v. Hunterdon Central Regional
High School,
        167 N.J. 230 (2001) ...................................10

RNC Systems, Inc. v. Modern Technology Group, Inc.,
         861 F. Supp. 2d 436 (D.N.J. 2012) ..............12, 24-27

Stochastic Decisions, Inc. v. DiDomenico,
        236 N.J. Super. 388 (App. Div. 1989) ..................12

**<u>Miscellaneous</u>**

<u>Restatement (Second) of Agency</u> § 283(a) (1958) ...............10

## PRELIMINARY STATEMENT

This brief is submitted by the defendants in this action, meaning Your Wellbeing, LLC ("YWB") and the individual defendants Charles Ronald Green Jr. ("Ron Green") and his wife, Melinda Green sometimes referred to jointly as "the Greens," in opposition to a motion for summary judgment by plaintiff Asta Funding, Inc. ("Asta").

This brief in opposition to plaintiff's motion for summary judgment is submitted concurrently with defendants' separate brief in support of their cross-motion for summary judgment dismissing plaintiff's complaint and awarding YWB judgment on its counterclaim. In the hope of minimizing confusion between the two, this brief is hereinafter referred to as "Defendants' Opposing Brief," and the cross-motion brief is hereinafter referred to as "defendants' Brief for Dismissal."

Arguments serving to establish basic legal infirmities in plaintiff's cause of action have been expounded at length in defendants' Brief for Dismissal. Since those arguments are equally availing as grounds for denying plaintiff's motion, they are accordingly incorporated herein by reference.

The primary purpose of this brief is to raise factual in addition to legal issues to prevent the award of summary judgment in Asta's favor. The same issues, however, serve at

the same time as further support for defendants' cross-motion and claim for affirmative relief.

### POINT I

**ASTA'S CLAIM TO HAVE BEEN DEFRAUDED IS BELIED BY UNCONTROVERTED EVIDENCE THAT (1) ITS OWN AGENT WAS RESPONSIBLE FOR THE COMPOSITION OF WHAT IT MISTAKENLY CONTENDS WERE FALSE STATEMENTS OF EXISTING FACT, AND (2) THAT SAID AGENT'S KNOWLEDGE OF THE STATUS OF YWB'S CLIENT ENROLLMENT EFFORT IS IMPUTED TO ASTA ITSELF.**

Asta's fraud claim is premised on allegations that defendants, to induce Asta to enter into the LOI, fraudulently misrepresented their intention to provide two schedules by specified future dates.  The schedules were expected to name the customers with whom YWB would have entered into contract as of those same future dates.  In the case of one such schedule, the date was December 17, 2010, and in the case of the other, was December 24, 2010.

Asta further alleges that certain schedules which defendants had prepared and delivered on December 14, 2010, which was two days prior to the signing of the LOI on December 16, 2010, were in fact the schedules referred to in the LOI. (The parties agree that the LOI, although dated December 17, 2010, was signed on December 16, 2010.)

In addition to alleging that the schedules delivered on December 14 induced it to enter into the LOI, Asta further

alleges that the same schedules also induced it to make what are described in the LOI as initial advances of funds, one on December 17, 2010 in the amount of $146,500, and the other on December 24, 2010 in the amount of $258,000, making a total of $404,500.

What Asta in its motion brief inexplicably fails to mention is that the Greens unequivocally declared in their respective testimonies, relevant portions of which are included as exhibits to the Goldberg declaration and reproduced in the text which follows, that it was Asta's own employee, Lorri Smith, who dictated and was responsible for the content of those schedules.

As stated in the opposing declaration of Melinda Green, Lorri Smith was assigned by Asta to monitor and consult with YWB personnel during the weeks preceding the execution of the LOI and thereafter, and during that time was present in the YWB office on a full-time basis. Through her daily involvement in YWB's affairs, Ms. Smith was positioned to know and did in fact know the status of YWB's efforts to enroll clients, including detailed knowledge about which of them were under contract and which were not.

As is made clear in the excerpts from Melinda Green's deposition testimony which appears below, it was Ms. Smith and not the Greens who was responsible for listing virtually all of the companies with whom YWB was striving to do business on the

3

schedules in question, copies of which form part of Exhibit 7 to Mr. Goldberg's supporting declaration. One such schedule is headed "Action Plan for monies needed for week ending 12-17-10," followed by a second line reading "For executed contracts by 12/17" (Goldberg Exhibit 7, second page), The second schedule is headed "Executed contracts by 12/24" (Goldberg Exhibit 7, third page).

The same testimony also refutes the bare conclusory assertion in Lorri Smith's declaration that the two schedules she was given on December 14, 2010 "were the final schedules referred to in the Letter of Intent." The same conclusion is also asserted in Paragraphs 9-13 of Asta's Statement of Material Facts. In neither instance is there with any explanation of how Asta arrived at that conclusion, or how it thinks the court should reckon with the LOI's explicit directive that each of the two schedules was "to be agreed upon by the parties."

Deposition testimony on these subjects begins with an excerpt from Ron Green's deposition transcript, which is taken from Goldberg Exhibit 5 starting on page 14, line 24 and continuing through page 15, line 25. All of the questioning was by Mr. Goldberg as Asta's attorney.

> Q.  Now referring to Melinda [Exhibit] 4 from earlier, that's an e-mail that you sent to Lorri Smith on December 14th, right?
>
> A.  On December 14th, that's correct.

Q.    And it attaches those two pages.  One of
      them is action plan for contracts.  I'm
      sorry.  Action plan for monies needed for
      the weekending 12-17-2010.*** The other
      pages are for contracts to be executed by
      December 24th; right?

A.    That's correct,

Q.    You sent those two documents to Ms. Smith?

A.    The document in question was authored by
      Lorri Smith.  She actually sat with me, and
      we sat down, and she organized how she
      wanted to have it.  And so on my laptop I
      went ahead, and it was being drafted.  So
      she wanted to make sure I sent her a copy
      so she had a copy, and she sent it out to -
      -

Q.    So I'm sorry.  At your laptop you typed it
      up?

A.    She was -- she was actually -- no, she
      drafted it.  She put it on a piece of
      paper.  I took it from the piece of paper
      and drafted it onto my laptop.

Goldberg Exhibit 5, p. 14, line 24 through p. 15, line 25.

    Defendant Melinda Green in her own deposition testimony

corroborated her husband's account of how the schedules came to

be composed.  There were, she said, "a lot of action plans that

Lorri Smith drew up" (Goldberg Exhibit 3, p. 46, lines 2-3).

This left Melinda unable to determine if the one issued on

December 14, 2010 was the final one, "because there were so many

action plans that Lorri had drew [sic] up."  Id., lines 19-20.

Melinda Green also testified that the schedules as drawn by Ms. Smith described "Contracts or contracts to be signed shortly." Id. at p. 46, lines 21-23. Speaking of Mr. Green's e-mail of December 14, 2010, Melinda Green added:

> [A.] This e-mail was drawn up on the 14th. That doesn't mean, even though it says here, action plan for monies needed ending 12-17. Like I said previously, there were multiple action plans drawn up. So for me to verify that this is the one that we're referring to in the letter of intent, I cannot tell you that this is the one. There were multiple e-mails and multiple action plans.

Id. at p. 48, lines 3-10.

Melinda Green made it clear in her testimony that she did not favor adding the names of clients not under contract to the list sent on December 14, 2010, as indicated below:

> Q. Okay. And when that list was provided, I mean, you wanted to make sure -- you wanted that list to be accurate, right?
>
> A. I wanted the list to be accurate.
>
> Q. And you knew also that Asta would be relying on that list, right?
>
> A. They would be relying on the list of contracts that were signed. I did not agree with putting on any names of clients that were not signed. I think we were forced into giving some information out on some contracts that were soon to be signed.

Id. at p. 54, line 21 through p. 55, line 6.

The portion of Melinda Green's deposition transcript included in Asta's motion papers did not include the question to which she provided this answer:

> A.    Yeah.  The only reason why any clients would be on this list that Lorri wrote up would be because they [were] either ready to sign, near signing and we were counting on them signing by the anticipated date, like the 24th or the 17th of December 2010.

Id. at p. 131, lines 2-6.

At a later stage in her deposition, the questioning of Melinda Green reverted to the same subject:

> [Q.]  [I]s it fair to say that December 14th is the final action plan?
>
> [Objection and colloquy between counsel omitted.]
>
> THE WITNESS:  No.
>
> BY MR. GOLDBERG:
>
> Q.    Why not?
>
> A.    Because [as] I've stated over and over and over again there were multiple action plans.  If this is what was provided to you in Exhibit 4, I believe, then the assumption is that that is the final action plan submitted.  And even with that action plan, whether it went out without my approval or not, because this writing on here, as I stated multiple times over and over again, for contracts executed 12/17 does not mean that there would be pending contracts to be signed or contracts signed. It's very misleading to Gary Sterns.
>
> Q.    So it should have been worded more precisely?

A.    Absolutely.

Q.    And it should have said contracts that may
      be executed by December 17th?

A.    That is correct.  And I believe at the top
      of this, because I saw some other ones that
      said exactly what you just stated or
      alluded to, that should or could be signed
      by then.  So in preparation for those
      contracts to be signed -- but we were
      always told that we needed an action plan,
      and we needed to have, you know, a list of
      accounts that are coming near to be closed,
      and so those were the accounts that she put
      on

Id. at p. 153, line 18 through p. 154, line 25.  (The foregoing
answer ends abruptly because Asta's motion papers do not include
the transcript pages needed to complete the sentence.  The next
answer begins in mid-sentence for the same reason.)

[A.]  few changes, and it was just keep it this
      way.  You want your money.  Let's get this
      going.  You want the intent signed.

Q.    Who said that?

A.    Lorri Smith.

Q.    And same with [Exhibit] Melinda 4, those
      two action plans, you didn't like the
      language at the top that says executed by
      December 17th and executed by December
      24th, right?

A.    I think it should have had -- that is
      correct.  I think it should have had
      additional verbiage stating that contracts,
      you know, with the hope those contracts
      would be signed by the 17th or verbiage
      that, you know, signed or not signed,
      either way.  I think this was very
      misleading.

Q.    You could amend that; right?

8

> A.    Could I have?  I could have, yeah, if I --
> but, again, I just remarked that on the
> letter of intent, Lorri made the statement,
> "This is how it needs to be worded."
> That's why I'm telling you that we did not
> draft these action plans.  The wording is
> created by Lorri for a reason.

Id. at p. 168, lines 1-22.

The Greens' depositions were taken on August 8, 2012, while Lorri Smith's declaration in support of Asta's motion, dated March 19, 2013, is considerably more recent.  During the months that have elapsed since the Greens testified as aforesaid, Asta has obviously had time to digest that testimony, fully appreciate what the Greens were saying about Ms. Smith's pivotal role in the composition of the two schedules, and respond to it if they chose.  Yet neither in her declaration or elsewhere has Ms. Smith made any attempt to deny or refute the Greens' testimony, which at present stands undisputed.

Additional proof that Lorri Smith knew about the status of YWB's client recruitment efforts as of December 14, 2010 is also provided in documentary form:  In an e-mail Ms. Smith sent to Mr. Green on that same date, a copy of which is contained in the attachment to Melinda Green's declaration in support of defendants' cross-motion, she made this simple request:  "Can I get copies of the two signed contracts?"  [Emphasis added.]

It cannot be overemphasized that Ms. Smith made that request on the very day (December 14, 2010) she received what she and Asta insist are the finalized schedules. It unmistakably demonstrates Ms. Smith's awareness that the number of clients YWB had under contract on that date was considerably smaller than the number listed on either of the two schedules.

While there is no reason to suppose Ms. Smith concealed her knowledge about YWB's business developments from her superiors, it is clear that her knowledge is in any event imputed to her principals as a matter of law. The New Jersey Supreme Court in Pfenninger v. Hunterdon Central Regional High School, 167 N.J. 230 (2001), quoting Handleman v. Cox, 39 N.J. 95, 104 (1963), held it to be "well settled that a principal is charged with the knowledge of his agent or servant respecting matters lying within the scope of the duties, activities, and responsibilities entrusted to him by the principal." 167 N.J. at 242.[1]

Defendants accordingly deny that they ever deceived Asta about the status of business development or anything else, and deny there was any justification for Asta supposing otherwise, or for bringing this lawsuit.

---

[1] As authority for the same statement, Handleman itself cited Restatement (Second) of Agency §283(a) (1958). Handleman, 39 N.J. at 104.

### POINT II

**PLAINTIFF'S CLAIM THAT DEFENDANTS HAD A
PRECONCEIVED INTENTION NOT TO PERFORM THEIR
CONTRACTUAL OBLIGATIONS IS CONTRARY TO THE
FACTUAL RECORD OF YWB'S ACTIONS AND CONDUCT.**

It is well settled that fraud cannot be predicated upon statements that were promissory in nature at the time they were made and involve actions to be done in the future. Anderson v. Modica, 4 N.J. 383, 391-392 (1950). Accordingly, "[s]tatements as to future events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." Alexander v. CIGNA Corp., 991 F. Supp. 427 (D.N.J.), aff'd, 172 F.3d 859 (3d Cir. 1998).

Asta on pages 25 et seq. of its brief appears to recognize the problem these principles present for it, and cites Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369 (App. Div. 1960), for the proposition that "a false representation of an existing intention, i.e., a 'false state of mind,'" is "an exception to th[e] rule" that an "alleged fraudulent representation must relate to some past or existing fact and cannot ordinarily be predicated upon matters in futuro." Id. at 380. It is presumably Asta's position that YWB did not intend to provide truthful and accurate schedules when it entered into the LOI.

A similar attempt to build a case based on "state of mind" fraud patterned after the same Ocean Cape case relied on by Asta was rejected by this court in RNC Systems, Inc. v. Modern Technology Group, Inc., 861 F. Supp. 2d 436 (D.N.J. 2012), as contrary to the economic loss doctrine (discussed in Point I of defendants' Brief for Dismissal) and contrary as well to the actual holding in Ocean Cape, which held that the fraud allegations in question were barred by a clause stating that no representations of the sort referred to had been made.  861 F. Supp. 2d at 453.  The court held that the alleged misrepresentations by RNC were "addressed squarely within the language" of the relevant contract and were "intrinsic to RNC's performance under the contract and have the same measure of damages as MTG's breach of contract claim."  Id.  The same comments are equally descriptive of Asta's claims against the present defendants.

The cases also leave no doubt, moreover, that "mere proof of non-performance does not prove a lack of intent to perform." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1186 (3d Cir. 1993), quoting Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 396 (App. Div. 1989).  Accord, Notch View Associates v. Smith, 260 N.J. Super. 190, 203 (Law Div. 1992)("nonperformance by the promisor is not evidence of an intention to deceive").

Of more immediate and direct relevance to the case at hand
is the Third Circuit's observation in Lightning Lube, supra, 4
F.3d at 1186, that intent not to perform is not proven by the
promisor's performance of less than all of what the agreement
requires.  As the court expressed the matter:

> [T]he fact that [defendant] Witco knew all along
> that it would not fulfill this discrete portion
> of the contract does not support an inference
> that Witco at the time of contracting intended
> to breach the entire agreement.

4 F.3d at 1186.

It was also held in Notch View Associates v. Smith, supra,
that defendant Smith's intent not to obtain financing for buyers
of housing units could not be proven by insufficient effort,
since there was evidence he had obtained "end loans for several
units," and in any event his "level of effort" was "irrelevant"
on the issue of intent.  260 N.J. Super. at 203.  The
plaintiffs' object in alleging fraud in Notch View was to
rescind a partnership agreement and validate plaintiffs' right
"to retain Smith's undistributed profits," both of which were
denied.  Id. at 209.

In the previously cited case of Ocean Cape, supra, the
Appellate Division affirmed the dismissal on summary judgment of
plaintiff's claim that the defendant did not intend to perform
his contractual obligation to correct certain defects in a
particular Cape May hotel by a specified date.  Holding that the

13

evidence in support of that its "broad allegation" was insufficient (id. at 381), the court appeared to consider the earnestness of the defendants' efforts as proof that it lacked fraudulent intent:

> We are of the opinion that a false intention cannot be gleaned from the allegations in the pleadings and affidavits. True, the complaint states that Masefield knew that the 'representations were false and that said warranties could not be honored.' But no facts are set forth in the attached affidavits which in any way give support to this broad allegation. Circumstances subsequent to the execution of the lease seem, in fact, to weaken the allegation. A repair crew was dispatched by Masefield on May 10, 1958 and, by plaintiff's own admission, work had begun by the middle of May on the removal of an unsightly and unsafe cornice of the hotel. Plaintiff's affidavits make repeated reference to the rate of speed with which the work was prosecuted, and blame the delay in completion of the repairs on the small number of workmen and the short daily hours devoted to these repairs. These circumstances do not support a finding of fraudulent intent.

Id. at 381.

While plaintiff asserts on page 8 of its brief that defendants claimed to have finalized contracts with the eight customers listed on the schedule for December 17, 2010, the same claim reemerges on page 26 of that brief, but with significant changes:  One page 26, the accusation consists of falsely representing that YWB "was on the verge of signing a contract with Holman Group, MKAA [Metropolitan Knoxville Airport

14

Authority], Palomar Health, and Ruby Tuesday," using names taken from both schedules. "On the verge" not only reveals plaintiff's awareness that contracts with the clients thus referred to were not "done deals," but also that whatever timetable the parties envisioned for finalizing the schedules was not rigid, but elastic.

There is nothing in the circumstances surrounding the transaction, however, to suggest that delay in the execution of contracts with certain of the companies defendants were striving to secure as clients, or the ultimate realization that YWB would perhaps not succeed in securing all of them, would be seen by either of the parties as a failure of performance.

As observed in Point IV of defendants' Brief for Dismissal, preparation of the schedules was not an element of contract performance, but only a condition precedent. While the fulfillment of that condition might in other circumstances have had the important effect of converting the LOI into an enforceable agreement, such a result was in this case prevented by Asta's categoric refusal to be bound to anything at all.

No vital interest on the part of Asta was jeopardized or imperiled because YWB was slow in realizing its customer goals, or was overly optimistic about what it could accomplish in the extremely short time limits a strict reading of the schedules would seem to provide. What the parties bargained for as

contract performance -- and what defendants were fully prepared to deliver -- was 49% ownership of YWB. Nothing relating to that performance was endangered by defendants' limited success in attracting clients in the dawning moments of its relationship with Asta.

On the basis of both the facts and the law, any claim or insinuation that defendants intended not to perform that contract is (a) legally untenable under the economic loss doctrine, (b) refuted by the vigor of defendants' performance efforts, and (c) predicated on a more rigid and exacting timetable for the performance of a condition precedent than the parties could logically have intended.

## POINT III

**ASTA'S CLAIM TO HAVE RELIED ON CLIENT SCHEDULES IS NOT CONSISTENT WITH ITS STATED REASONS FOR WITHDRAWING FROM THE YWB VENTURE.**

There are also serious issues of material fact that prevent Asta from establishing on motion for summary judgment that it based its decision to withdraw from the venture on the events it now cites as proof of YWB's supposed deceptiveness. The factual record strongly suggests it did not.

Even if YWB were answerable in damages for the value of an investment that Asta chose to discard upon discovering that some of YWB's prospects were not under contract, Asta's claim for

summary judgment would require proof that it actually based its decision to withdraw on that discovery.  The business record, however, suggests that Asta acted for very different reasons.

Asta's February 7, 2011 letter announcing that it "does not wish to proceed with the Transaction," was written eight weeks after it received the two client schedules.  It makes no mention of the supposed discrepancy involving clients under contact, but instead makes it appear that Asta's primary concern was that YWB "failed to disclose" that there were "other equity owners in YWB (Mr. & Mrs. Miller) and that "you blatantly misrepresented on several occasions the debt owed the Miller's [sic] and others."

Asta's motion brief makes no mention of the Millers, apparently recognizing that defendants' alleged failure to mention them was neither wrongful nor material to that agreement.  As noted on pages 8-10 of defendants' accompanying Brief for Dismissal, the Millers' combined 5% shareholding in YWB (Goldberg Exhibit 1, pages 1 and 3)  would not have prevented the Greens from using their own shareholdings to make Asta a 49% shareholder as called for in the LOI.  As the court made clear in Dean v. Barrett Homes, Inc., 406 N.J. Super. 453 (App. Div.), rev'd on other grounds, 204 N.J. 286 (2009), where there is a claim of "omission rather than affirmative statement" (id. at 461), it cannot succeed without "proof that [the defendant] intentionally concealed any information with the

intention that plaintiff[s] would rely on the concealment, and
that the information was material to the transaction."  Id.,
quoting in part from Marrone v. Greer & Pohlman Construction,
Inc., 405 N.J. Super. 288, 297-298 (App. Div. 2009).  [Internal
quotation marks omitted.]

    To the same effect is City v. Millville v. Rock, 683 F.
Supp. 2d 319, 330 (D.N.J. 2010):  "It is well settled that [a]
party has no duty to disclose information to another party in a
business transaction unless [1] a fiduciary relationship exists
between them, [2] unless the transaction itself is fiduciary in
nature, or [3] unless one party expressly reposes a trust and
confidence in the other."  [Bracketed inserts by the court.
Citations and internal quote marks omitted.]

    Asta's February 7, 2011 project-termination letter
(Goldberg Exhibit 8) makes no mention of the client schedules,
but offers other and different reasons for its decision, e.g.,
"[t]he due diligence conducted by Asta with respect to YWB has
not been satisfactory," and "[t]here are numerous other legal
and operational issues which are unacceptable to Asta."  Such
statements leave little doubt that Asta's withdrawal was
entirely the product of its own assessment of YWB's business
prospects in general, and not its failure to meet client
recruitment goals that were unreasonably optimistic to begin
with.

18

While the withdrawal letter concludes by demanding the return of the full amount of its investment within 30 days of the letter and warns of its intention to impose "legal fees and costs," it makes no attempt to argue that its rights in that regard are based on breach or wrongdoing by YWB.  The letter instead insinuates that YWB's duty to refund the money was the automatic and unspoken corollary of Asta's decision not to proceed.

**POINT IV**

**THE LOSSES ASTA SUSTAINED BY EXERCISING
ITS OPTION TO ABANDON THE PROJECT ARE
NOT RECOVERABLE AS LEGAL DAMAGES.**

What Asta chooses to characterize as damages were actually the result of its voluntary decision not to provide the capital resources YWB needed to implement its business plan.

Regardless of how many prospective clients YWB had or did not have under contract when Asta on February 7, 2011 exercised its right to withdraw from the project, the evidence shows YWB was assiduously soliciting business, and was in serious discussions with a number of promising prospects.[2]  (Declaration of Melinda Green, paragraphs 5, 11-14.)

---

[2] Defendants' analysis on damages assumes _arguendo_ that Asta withdrew from the project because of discrepancies in schedules relating to clients under contract.  However, Asta's February 7, 2011 letter (Goldberg Exhibit 8) notifying YWB that "it does not

Four of the prospective customers identified in the schedules had signed contracts prior to the stated deadlines. (Defendants' answers to plaintiff's interrogatories -- Goldberg Exhibit 13B -- responses to Interrogatory No. 4(a) and 4(b).)

The business model YWB developed had received enthusiastic approval from at least one of its major prospects, the City of Miami, which, unfortunately, was forced by budgetary cutbacks to discontinue or postpone contract negotiations. Nadeen Medvin, Ph.D., who during the relevant time period was serving as the City's Employee Assistance Program Administrator and as such in charge of wellness programs for city employees (Deposition of Nadeen Medvin, Ph.D. -- excerpts of which comprise Goldberg Exhibit 26 -- p. 7, lines 14-21), described as follows her assessment of YWB based on demonstrations provided by Melinda Green

> Q.   And did you ever receive examples of programs from Melinda Green?
>
> A.   Well, in some of our conversations I was able to go online and look at some examples of their modules, which I like very much. Again, I was very impressed with the quality of their work and their professionalism.

---

wish to proceed with the Transaction" and explaining its reasons for that state of mind makes no mention of falsified schedules or anything else suggestive of concern with client recruitment. There is accordingly a material issue of fact as to whether Asta's professed dismay with the status of clients under contract was genuine or a claim belatedly asserted for purposes of this lawsuit.

Medvin dep., p. 32, lines 15-21.

Dr. Medvin was "Very positive" about YWB's business model.
(Medvin dep., p. 45, lines 7-14.)  Melinda Green agrees that the
City of Miami "just loved our concept."  (Melinda Green dep. --
Goldberg Exhibit 3 -- p. 129, lines 4-6.)  Negotiations had
reached the stage of submitting information and discussing the
design of a program specifically for City of Miami employees
(Medvin dep., p. 43, lines 14-16), and her own department was at
least tentatively "on board" (Medvin dep. p. 42, line 24),
although it would be necessary to obtain approval from upper
management (Medvin dep. p. 39, lines 11-18), just as with any
other organization (Medvin dep. p. 42, lines 17-18).
Unfortunately changes in the economy (Medvin dep., p. 45, lines
14-15) led to budget cutbacks so severe that resulting layoffs
and leadership changes complicated the process of obtaining
approval (Medvin dep., p. 11, lines 22-25; p. 27, lines 1-4),
and ultimately negotiations could not go forward Medvin dep., p.
27, lines 22-24; p. 47, lines 11-17) when managerial personnel
"that were on board that would support such a program" were
themselves laid off (Medvin dep., p. 33, lines 12-18).  Even
then, Dr. Medvin was hopeful that the City's financial situation
would improve sufficiently that they could again move forward
with YWB.  (Medvin dep., p. 47, lines 5-20.)  Ms. Green

21

accordingly saw the situation as "a waiting game," i.e., waiting
for the City's finances to improve.  (Melinda Green dep. --
Goldberg Exhibit 3 -- p. 117, lines 7-15.)

Alan Jones of the Metropolitan Knoxville Airport Authority
in his deposition testimony (excerpts of which form Goldberg
Exhibit 17) described a series of meetings and contacts with YWB
sales representative Doug Hayes which had progressed to the
point where he was provided with a form contract.  (Jones dep.,
p. 15, lines 3-15.)  Discussions continued even after his
insurance representative told him that insurance would not cover
the cost of YWB's wellness plan (Jones dep., p. 26, lines 1-10)
and the decision whether to enter into contract with YWB was
"still up in the air" (Jones dep., p. 28, lines 2-3).  After
being repeatedly asked by plaintiff's counsel to agree with the
proposition that the Airport Authority was never close to
signing an agreement with YWB, Mr. Jones said that this was so
only in the sense that "we weren't close to signing it because
we never signed it."  (Jones dep., p. 29, 6-8.)

Michael B. Shea, Director of Compensation and Benefits for
Palomar Health in Escondido, California, likewise recalled in
his deposition (excerpts from which form Goldberg Exhibit 23) a
series of telephone calls and e-mails exchanged with YWB sales
representative Bruce Dummit commencing in September of 2010.
(Shea dep., p. 8, line 17 through p. 9, line 13.)  These were

followed by a telephone conference in October (Shea dep., p. 13, line 12 through p. 14, line 9) and an in-person meeting with Mr. Dummit and Melinda Green in November (Shea dep., p. 22, lines 8-21) at which they made it clear to Mr. Shea that they were "very interested" in setting up a wellness program with Palomar Health.  (Shea dep., p. 23, lines 24-25.)  Mr. Shea was likewise interested in a wellness plan for Palomar Health.  (Shea dep., p. 24, lines 9-13.  He provided insurance information to allow YWB to determine whether his insurer would cover the cost of a YWB wellness program (Shea dep., p. 12, line 12 through p. 13, line 5; p. 18, lines 12-23; p. 22, lines 1-7).  They provided him with a sample contract (Shea dep., p. 30, lines 5-19), and he discussed with the Chief Human Resource Officer, Brenda Turner, the possibility of replacing or augmenting Palomar Health's existing wellness plan with the YWB plan (Shea dep., p. 39, lines 2-21).  YWB was still under consideration in December of 2010.  (Shea dep., p. 27, lines 1-7.  Eventually he had to tell YWB that Palomar Health was not going to proceed, but he could not recall when that was.  (Shea dep., p. 43, lines 1-21.)

Based on these several examples gleaned from the deposition excerpts provided by Asta, it is clear that Melinda Green and the YWB sales staff were diligently striving to sign up clients for YWB's programs.  In some cases they succeeded, in others they came close, and in other they might well have succeeded had

funding not been abruptly withdrawn. The history of this intense sales effort thoroughly refutes Asta's assertion that defendants intended not to perform. See also the declaration of Melinda Green, paragraphs 12-13.

The question of whether or not YWB would ultimately have succeeded remains unanswerable because in Section 2 of the LOI, YWB agreed "not to negotiate or enter into or continue discussions with any other person or entity with respect to a similar business arrangement."

In addition, Asta's claim to be owed the sum of $404,000 in consequence of YWB's supposed fraud made it unrealistic to suppose that a new investor could be found for what was not only a fledgling company, but a company with financial problems whose probity Asta had called into question. An unsuccessful effort to find such an investor was nevertheless made.

By deciding not to invest additional funds, Asta may have wisely spared itself an additional loss. One can just as easily speculate, however, that but for Asta's unwillingness to continue funding as envisioned by the LOI, its investment in YWB would have been returned to it many fold. Asta's breathtakingly audacious multi-million-dollar demand for the profits it claims to have lost by not staying the course (plaintiff's brief, page 22) indicates its own ambivalence in this regard.

The case of <u>RNC Systems, Inc. v. Modern Technology Group</u>, 861 F. Supp. 2d 436 (D.N.J. 2012), cited in defendants' Brief of Dismissal in connection with the economic loss doctrine as well as the legal effect of the "entire agreement" clause, is also instructive on the question of damages.  The licensing agreement in that case authorized defendant MTG to sell RNC's "Limo Touch" electrical control panels for installation in limousines.  681 F. Supp. 2d at 440-441, thereby taking over the marketing functions that RNC previously conducted through its own efforts, and compensated RNC on a royalty basis.  <u>Id</u>. at 446.

RNC admittedly breached the agreement "by providing a defective Limo Touch product," <u>id</u>. at 445, and by "failing to develop a [related] system," <u>id</u>. at 448.[3]

RNC did not disclose to MTG that the sales it had been making prior to entering into the licensing agreement to its major customer, Tiffany Coach Works, Inc., were made at "a discounted price of $200 over RNC's cost of production."  It was a price concession RNC had made "in return for Tiffany providing RNC with funding and assistance in developing the Limo Touch technology."  <u>Id</u>. at 456.

After MTG took over the Tiffany account, it made what the court described as the "voluntary, albeit difficult, business

---

[3] "In reality, the Limo Touch product proved to be difficult to support and ultimately caused several car fires."  Id. at 451.

decision" (id. at 457), to continue the practice of selling to Tiffany, described as "MTG's biggest customer," at the same "discounted price rather than lose Tiffany as a customer." Id.

After several years MTG stopped paying royalties, based on a disputed interpretation of the license agreement which was rejected by the court. RNC successfully sued for unpaid royalties and MTG counterclaimed for the breaches of contract which RNC admitted it had made by (1) providing a defective Limo Touch product, and (2) failing to develop a planned new system. Id. at 455. As part of the same counterclaim, however, MTG also claimed damages for the "[a]dditional profits MTG would have earned if it had sold Limo Touch to Tiffany at full price, rather than the discounted price in the Tiffany/RNC Agreement." Id. at 455.

The court rejected that claim for reasons directly supportive of YWB's position on damages in the present case:

> It is difficult to see how these damages are recoverable because they do not flow from RNC's breach of the License Agreement. RNC breached the License Agreement by providing a defective Limo Touch product, failing to develop the Multiplex system and allegedly not properly supporting the Limo Touch product. These events have nothing to do with MTG's decision to continue selling Limo Touch to Tiffany for the discounted price of $200 over cost. While Tiffany was MTG's biggest customer, and RNC did not disclose its discount arrangement with Tiffany to MTG prior to executing the License Agreement, MTG is a sophisticated corporate party and made the decision to

26

> continue selling Limo Touch to Tiffany at a
> discounted price rather than lose Tiffany
> as a customer. This was a voluntary, albeit
> difficult, business decision and is unrelated to
> RNC's breach of the License Agreement.

Id. at 456-457.

MTG had at the time been marketing Limo Touch systems for several years (id. at 440), and had pledged as part of its agreement with RNC to stop selling a competitor's products. Id. at 456. The steps MTG took to retain the patronage of its largest customer was more clearly dictated by practical business necessity than anything confronting Asta in the case at hand.

While as indicated by the foregoing quotation it was apparently with some reluctance that the court rejected MTG's claim for lost profits on the Tiffany sales, the decision was nevertheless correct: Despite the court's seeming recognition of the dilemma confronting MTG when it continued selling at the lower price, the loss of profits did not "flow from RNC's breach of the License Agreement," id. at 456-457, but from MTG's voluntary business decision to reduce its profit margin on Tiffany sales.

The same logic applies a fortiori to the present case: Asta made a comparatively modest initial investment in YWB as part of a calculated business risk that would enable YWB to demonstrate its potential, and afford Asta a basis for determining if YWB warranted the support required to advance to the next stage.

27

The knowledge Asta gained was exactly what it bargained for and received.  Asta's loss of its initial investment was the known and predictable consequence of withholding further support.  It was not a loss that can be logically ascribed to YWB's having fewer clients under contract than Asta supposed that it should.

Mystery shrouding Asta's actual reasons for withdrawing from the venture is highlighted by its extraordinary (and altogether shameless) demand for the loss of future profits it claims to have sustained by choosing not to proceed with the venture, which it calculates at $4,715,132.00 (Asta brief, page 22).  It is perhaps redundant to note that the demand ignores New Jersey's so-called "new business rule," which despite a checkered history as described in Bell Atlantic Network Services, Inc. v. P.M. Video Corp., 322 N.J. Super. 74 (App. Div. 1999), apparently stands as the law of this State.  It posits that the prospective profits of a new business venture "are too remote, contingent and speculative to meet the legal standard of reasonable certainty."  Id. at 98.

## CONCLUSION

All of the grounds cited in defendants' Brief for Dismissal are further supported by evidence of the following:

28

(A)   Asta was never deceived about the status of YWB's client-production efforts, having learned through Lorri Smith what defendants had and had not achieved.

(B)   Asta's claim that defendants falsified their state of mind regarding goals for the recruitment of clients is refuted by the facts pertaining to their efforts to succeed and the applicable legal standards for evaluating their efforts.

(C)   The facts contradict Asta's claim to have based its decision to withdraw from the YWB venture on the basis of representations pertaining to client recruitment.

(D)   The losses Asta claims to have lost as a result of supposed fraud are in fact wholly attributable to YWB's own decision to abandon the venture.  Asta's damages theory, moreover, runs afoul of New Jersey's new business rule, which regards the prospective profits from a new business venture as too speculative and uncertain for recovery.

For these reasons, (1) YWB's cross-motion should be granted in all respects; (2) Asta's motion for summary judgment should be denied with prejudice; and (3) YWB should be awarded judgment for $40,408.93 plus prejudgment interest based on its surrender to Asta's baseless claim of entitlement to the return of its investment.

Respectfully submitted,

CROWLEY & CROWLEY

By: _____
        Noel C. Crowley
Attorneys for defendants

Dated:   April 22, 2013