UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASTA FUNDING, INC., | Civ. No. 11-2202 (KM)(MAH) |
| Plaintiff, | |
| | **MEMORANDUM OPINION** |
| v. | |
| YOUR WELLBEING, LLC; CHARLES RONALD GREEN, JR., and MELINDA GREEN, | |
| Defendants. | |

**MCNULTY, U.S.D.J.:**

    The plaintiff, Asta Funding, Inc. ("Asta"), entered into a tentative agreement to fund the launch of defendant Your Wellbeing, LLC ("YWB"), whose founders and principals were defendants Charles Ronald Green, Jr., and Melinda Green. YWB, formed in 2010, developed an employee wellness program. The program was sold to employers as an employee benefit and as a means to improve health while reducing healthcare and insurance outlays. In late 2010, YWB worked with Asta to fund its fledgling operations; simultaneously, it solicited large employers as customers. At the heart of this action is a dispute about what factual representations YWB made to Asta concerning the status of its dealings with those third party employers. Asta contends that it advanced an initial $404,500 because YWB falsely represented that it had commitments from prospective customers. By early 2011 the parties broke off their dealings, and began disputing whether Asta was entitled to the return of the funds it advanced.

    Asta filed this action on March 18, 2011, in New Jersey Superior Court, Bergen County. On April 18, 2011, Defendants removed the action to this Court. On May 26, 2011, they answered and filed counterclaims. The parties have proceeded through discovery, and have filed the pending motions: (a) Asta's motion for partial summary judgment finding Defendants liable on its breach of contract, unjust enrichment, and fraud counts; and (b) Defendants' motion for summary judgment. I have reviewed the briefs, exhibits, and other pleadings. Based on that review, I will deny both sides' motions, finding numerous unresolved issues of fact.

I.   **FACTUAL BACKGROUND**[1]

This action centers around negotiations and representations surrounding the parties' signing of a Letter of Intent ("LOI") dated December 17, 2011.

Charles and Melinda Green, the principals of YWB, are husband and wife. They formed YWB in 2010 to operate an online wellness program for employers, which would offer their employees preventive health care services. Those services would include online diet, exercise, and smoking cessation programs, as well as an online portal for charting progress, finding doctors, and making doctor's appointments. (Pltf's 56.1 Statement at ¶¶ 1-3; Dfds' Resp. Statement at ¶¶ 1-3).

YWB promoted its wellness program as a way to improve employee health and decrease health care costs. YWB's revenue would come from contracts with employers who would agree to pay YWB a monthly fee for each employee enrolled in the program. (Pltf's Statement at ¶¶ 4-5; Dfds' Resp. at ¶¶ 4-5).

*Events Preceding the Signing of the Letter of Intent*

In the fall of 2010, the Greens approached Asta about a capital investment in YWB. On December 7, 2010, the Greens provided Asta with YWB's business plan and profit projections. (Pltf's Statement at ¶¶ 6-7; Dfds' Resp. at ¶¶ 6-7). YWB's prospectus projected $6.286 million in net profits from February 2011 through April 2011. (*See* Pltf's Statement at ¶ 8; Dfds' Resp. at ¶ 8).

On December 14, 2010, Ron Green sent Asta's Lorri Smith an email regarding a "YWB Action Plan." Attached was an "action plan with executed contracts and the monies needed to move those contracted groups forward." (Pltf's Statement at ¶ 9; Dfds' Resp. at ¶ 9). The parties agree that the attachments were two single-page "Schedules." The first Schedule was called "Action Plan for monies needed for week ending 12-17-10, For executed contracts by 12/17." The second Schedule was called "Executed contracts by 12/24." (Pltf's Statement at ¶¶ 10-11, 13; Dfds' Resp. at ¶¶ 10-11, 13). The parties agree that the first schedule listed eight employers, and the second listed seven additional employers. (Pltf's Statement at ¶¶ 11, 13; Dfds' Resp. at ¶¶ 11, 13). They differ, however, in their interpretations of those schedules.

Asta asserts that the schedules signified that YWB had executed contracts with all of the listed employers. (Pltf's Statement at ¶¶ 10, 11, 13). The Greens "deny that such schedules can be reasonably interpreted as assertions that all of the companies listed thereon had executed contracts at the time the schedules were sent...The schedules contained the names of companies YWB had signed, expected or hope to sign by the dates shown therein, not companies that had necessarily already entered into contracts with

---

[1] I set forth the facts as agreed and disagreed upon in the parties' respective L. Civ. R. 56.1 Statements.

2

YWB." (Dfds' Resp. at ¶¶ 10, 11, 13). Indeed, the Greens say, Asta *required* them to list *prospective* employer-clients on the schedules, and Asta's on-site representative, Lorri Smith, participated in the drafting. (*Id.* at ¶¶ 10, 16). According to the Greens, the numbers to the right of each employer's name on the schedules represent an *estimated* number of employees who would be signed up for the program. According to Asta, the numbers (falsely) represent employees *actually* committed to the program. (*Compare id.* at ¶¶ 12, 14 (citing Melinda Green's Deposition) *with* Pltf's Statement at ¶¶ 12, 14).

Lorri Smith, an Asta employee, was sent to YWB's office "to become familiar with YWB's operations and help Asta to determine whether it should sign the LOI [Letter of Intent] and invest money in YWB's operations." (Dfds' 56.1 Statement at ¶ 7; Pltf's Resp. at ¶ 7). The Greens state that she was there for several days before the signing of the LOI, and that she was present while YWB representatives were soliciting prospective clients. (Dfds' Statement at ¶¶ 6, 8). Asta admits as much but denies any inference that Smith was aware of details or contingencies associated with prospective clients. (Pltf's Resp. at ¶¶ 6, 8). According to Asta, Ms. Green lied to Smith: she said "that eight of the prospective contracts listed in the schedules were finalized, those customers were eager, willing, and able to sign contracts with YWB, that Melinda had declined to accept their signatures until YWB had Asta's money, that those eight customers would sign within days of YWB's receipt of Asta's money, and that the other seven contracts were almost finalized and would be procured within one week of the LOI." (Dfds' Resp. at ¶ 9).

*The Letter of Intent*

On December 16, 2010, Asta and YWB, through the Greens, executed the LOI, which was dated December 17, 2010. (Pltf's Statement at ¶ 18; Dfds' Resp. at ¶ 18; Dfds' Statement at ¶ 1). Asta claims that it was only "[b]ased on the Schedules, [that it] decided to enter into [the] letter of intent with YWB." The Greens deny this. (*Compare* Pltf's Statement at ¶ 17 *with* Dfds' Resp. at ¶ 17). Asta contends that the Greens intended for it to rely on the Schedules in signing the LOI; the Greens deny any such intent. (*Compare* Pltf's SUF at ¶ 16 *with* Dfds' Resp. at ¶ 16).

The LOI provided that Asta would advance $146,500 to YWB by December 17, 2010, and another $258,000 by December 24, 2010. (Pltf's Statement at 19). The pertinent text is as follows:

> <u>Initial Cash Advances</u>: On or before December 17, 2010, Asta intends to advance $146,500 to YWB in accordance with a schedule to be agreed upon by the parties, for the purpose of funding certain agreements that YWB has executed with certain clients, as indicated on a schedule to be provided by YWB and amended as necessary to reflect the agreements executed as of that date. On or before December 24,

3

> 2010, Asta intends to advance $258,000 to YWB in accordance with a schedule to be agreed upon by the parties, for the purpose of funding certain other agreements that YWB has executed with certain clients; as indicated on a schedule to be provided by YWB, and amended as necessary to reflect the agreements executed as of that date.

(Pltf's Statement at ¶ 21; Dfds' Resp. at ¶ 21; Letter of Intent (Decl. of Eric Goldberg at Ex. 2)). Plaintiff contends, and Defendants deny, that the LOI signifies that the first advance was "to fund eight *executed* contracts between YWB and third-party clients," and that the second advance was to "fund seven other *executed* contracts." (*Compare* Pltf's Statement at ¶ 19 *with* Dfds' Resp. Statement at ¶ 19).

The LOI further provided that Asta intended to advance $1,895,500 by February 28, 2011, if it was satisfied that certain conditions had been met. (Pltf's Statement at ¶ 20; Dfds' Resp. at ¶ 20). Then, "[i]n consideration for its [total] $2.3 million of cash advances, Asta shall have a 49% ownership interest in YWB and shall be entitled to 75% of the profits of YWB." (Dfds' Statement at ¶ 3; Pltf's Resp. at ¶ 3).

Asta contends that the LOI *obligated* YWB to execute the eight contracts listed in the first schedule by December 17, 2010, and the seven contracts listed in the second schedule by December 24, 2010. YWB denies this, claiming that the dates were "forecast" dates and that the provisions constituted conditions precedent but not a contractual obligation. YWB adds that Asta was well aware that it had not secured all of the listed contracts, and that Asta's subsequent withdrawal from the project was actually motivated by other reasons, as stated in a termination letter. (*Compare* Pltf's Statement at ¶¶ 22-23 *with* Dfds' Resp. at ¶¶ 22-23).

The LOI provided that final terms would be memorialized at a later date, but that Asta was under no obligation to go through with the deal. The letter was "binding on YWB, but not on Asta." (Pltf's Statement at ¶¶ 24-25; Dfds' Resp. at ¶¶ 24-25).

The Greens point out that "the LOI contains no provision for the return to Asta of the funding it provided to YWB in the event of a decision by Asta not to proceed with the venture." (Pltf's Statement at ¶ 2). Asta responds that this is a mere legal conclusion, but admits "that the LOI does not expressly provide a remedy for the breach of the LOI." (Dfds' Resp. at ¶ 2).

*Asta's Advances, and the Unraveling of the Relationship*

Asta advanced $146,500 to YWB on December 17, 2010, and another $258,000 on December 24, 2010, for a total of $404,500.

4

The parties agree that YWB did not execute contracts with four of the eight employers on the first schedule by December 17, 2010, or at any time thereafter. They also agree that YWB did not execute contracts with seven of the eight employers on the second schedule by December 24, 2010, or thereafter. (Pltf's Statement at ¶¶ 36-37, 39-40; Dfds' Resp. at ¶¶ 36-37; 39-40). Those contracts would have netted YWB over 68,000 employee-users. (Pltf's Statement at ¶¶ 38, 41; Dfds' Resp. ¶¶ at 38, 41). In Asta's words, YWB "represented in the LOI" that it "would enter into" contracts with the various employers by the target dates. (Pltf's Statement at ¶¶ 26, 28, 30, 32, 34).[2] Asta notes, however, that various circumstances caused certain of these contracts to not be executed. (*See id.* at ¶¶ 33, 35; Dfds' Resp. at ¶¶ 33, 35).

On February 7, 2011, Asta sent Defendants a letter terminating the transaction contemplated by the LOI and demanding the return of the amounts advanced. Two days later, having consulted with an attorney, Mr. Green advised Asta that YWB accepted the notice of termination "and will return all uncommitted funds not later than Monday, close of business…YWB is hopeful (but cannot commit) that it will be able to return the balance of previously spent or committed funds within the next 30 days." (Pltf's Statement at ¶¶ 42-44; Dfds' Resp. at ¶¶ 42-44). As to the unused and uncommitted funds, YWB wanted to complete an accounting first; as to used and committed funds, it was noncommittal and hoped to return the funds within a reasonable period. (Pltf's Statement at ¶ 44; Dfds' Resp. at ¶ 44). Throughout February and March, the Greens advised that they intended to return the funds and were working on doing so. (Pltf's Statement at ¶¶ 45-48; Dfds' Resp. at ¶¶ 45-48). Eventually, however, the Greens hired a new attorney and thereafter refused the refund the money. (Pltf's Statement at ¶ 49) Defendants "deny any implication that YWB was financial capable of returning funds" at that point. (Dfds' Resp. at ¶ 49). YWB considers Asta's decision not to provide further funding to be a "unilateral" one, to which it did not agree. (Dfds' Statement at ¶ 10).

## II.   ANALYSIS OF PENDING MOTIONS

Plaintiff's motion, being one for partial summary judgment, does not reach all of the causes of action, but rather only a few of them (while also arguing for the dismissal of Defendants' counterclaim). Defendants, meanwhile, seek judgment dismissing all of Plaintiff's causes of action.

### A.   Applicable Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000). In

---

[2] This alleged undertaking is the basis of Asta's breach of contract claim. *See* Amended Complaint at Count One. Defendants correctly point out that these employers were not, as Asta's Statement insinuates, identified by name in the LOI.

deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Of course, this standard does not operate in a vacuum: "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S.at 254 (1986).

### B. Asta's Breach of Contract Claim

Plaintiff argues that it is entitled to summary judgment on Count One of its First Amended Complaint, which alleges breach of contract. It contends that YWB breached the Letter of Intent (LOI) by failing to execute all 15 contracts set forth in the schedules to which the LOI referred. As a result, Asta contends, it lost $5 million in profits. (Br. Supp. Pltf's Mot. Summ. J. at 18-24). Defendants respond that this was the nonoccurrence of a condition precedent, not a breach of contract. (Br. Supp. Dfds' Mot. Summ. J. at 28-32).

The court must examine the language of the agreement to determine the parties' stated intent. To the extent necessary to resolve ambiguity, the court will consider the parties' course of dealing and the circumstances attendant to the drafting of the LOI. (Pltf's Br. Supp. Mot. Summ. J at 18-19 (citing *Morales v. Santiago*, 217 N.J. Super 496, 501 (App. Div. 1987); *McBarron v. Kipling Woods, LLC*, 365 N.J. Super 114, 116-17 (App. Div. 2004)).

To say that obtaining contracts is a condition precedent, rather than a duty, does not necessarily get defendants off the hook. The concept of a "condition precedent" is a multihued and malleable one, but in general, it is an event that must occur before a party's duty to perform will arise. It can be external to the contract and the parties: for example, A may enter into an agreement to lease B's apartment in Chicago in October, provided that the Chicago Cubs are in the World Series. In the unlikely event that the Cubs are

6

not in the World Series, no duties arise and the contract becomes a nullity. But a condition precedent can also be intertwined with the parties and their dealings; that is, one party's performance, or part performance, can be a condition precedent to the other party's duty to perform. And where, as here, the contract governs a relationship in which both sides perform on an ongoing basis, matters get complicated.

Defendants argue that the LOI does not expressly commit YWB to execute certain contracts as a contractual duty. On the other hand, Asta says that Defendants represented that they *had* executed the contracts, so the imposition of a "duty" to do so was beside the point. More generally, there are multiple factual disputes as to the meaning of the parties' agreement. For example, the parties dispute the genesis and meaning of the two Schedules and the cover email enclosing them. The meaning of the LOI itself is too unsettled, and the evidence too murky and conflicted, for me to be satisfied that I could dismiss this claim under the Rule 56 standard.

### C. Asta's Unjust Enrichment Claim

Plaintiff also seeks summary judgment on its claim of unjust enrichment, contained in Count Three of its First Amended Complaint. It contends that YWB received a benefit (the initially advanced sums), the retention of which is inequitable because the benefit was obtained through false pretenses. (Br. Supp. Pltf's Mot. Summ. J. at 24-25). Defendants move for summary judgment dismissing this claim. They say that they have not "retained" a benefit, *i.e.*, a measurable increase in their wealth, inasmuch as they allegedly spent all of the initial advances on business expenses and received no return. Defendants also claim that this remedy is not available because there is a valid contract that governs. (Br. Supp. Dfds' Mot. Summ. J. at 37-38).

"An action brought on a theory of quantum meruit sounds in restitution [], and to sustain a claim of unjust enrichment, the claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987). "[O]ne person should not be permitted unjustly to enrich himself or herself at the expense of another, <u>but should be required to make restitution of or for property or benefits received, retained, or appropriated</u>, where it is just and equitable that such restitution be made and where such action involves no violation or frustration of law or opposition to public policy either directly or indirectly." 66 Am Jur 2d Restitution and Implied Contracts § 2 (emphasis added); *see also Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 108-109 (App. Div. 1966) (citing *St. Paul Fire, etc., Co. v. Indemnity Ins. Co. of No. America*, 32 N.J. 17, 22 (1960)).

This cause of action will rise or fall with several disputed, or completely unanswered, factual issues. Indeed, "unjust enrichment requires a factual

examination of the circumstances and of the conduct of the parties." 66 Am. Jur. 2d, *supra*, § 3. That statement is particularly apt where the theory is that the benefit was received through "false pretenses." The issue of false pretenses is squarely in dispute, effectively hinging on Plaintiff's ability to prove fraudulent or untrue statements by the Greens. Whether YWB made misrepresentations of fact is a highly disputed matter. I am skeptical of YWB's argument that it did not "retain" a benefit because it spent the money, but it argues more seriously that it was the parties' mutual intent that the money be spent on certain expenses. Asta, on the other hand, argues with some force that, contract or no, its investment was induced by false statements that contracts were in place, and the investment should therefore be returned. YWB's initial return of $40,000, and its contemporaneous statements that it would return the rest, corroborate Asta's position that this was the parties' intent.

The evidence, however, is in conflict. It does not conclusively establish liability in quantum meruit, but it does not rule it out, either. I will deny both motions concerning this cause of action.

### D. Asta's Fraud Claim

Plaintiff contends that it is entitled to summary judgment on its fraud count (Count Five of the First Amended Complaint) because the evidence shows that YWB made intentional, material misrepresentations inducing Asta to make the initial advances totaling $404,500.

In its brief, Plaintiff contends that Defendants made misrepresentations (1) on the schedules sent by email to Asta, in that the schedules described all of the employer contracts as "executed contracts," and (2) when Melinda Green gave Asta "oral reassurance that the contracts were imminent." (Br. Supp. Pltf's Mot. Summ. J. at 8-16, 26). Defendants counter by contending that Asta's employee Lorri Smith, who was on-site at YWB in the days preceding the LOI, co-authored the schedules in question, working directly alongside Ms. Green and physically drafting it in the first instance, and further insisting that the schedules be laid out in that particular fashion with that particular language. Defendants add that Smith knew about the status of YWB's client recruitment efforts. On this latter point, Defendants point to evidence tending to show that Smith knew for a fact that only two contracts were actually signed at the time. (Dfds' Br. Opp. Mot. Summ. J. at 2-11). Defendants also argue that Asta's stated reasons for withdrawing from its funding arrangement, which did not include YWB's third party contracts, is evidence that it was not misled. (*See id.* at 16-17).

Asta also alleges, in its Local Civil Rule 56.1 Statement, that the LOI itself contains a misrepresentation, in that it referred to "certain agreements that YWB *has executed* with certain clients, as indicated on a schedule to be provided by YWB and amended as necessary to reflect agreements executed as of that date." (Pltf's Statement at ¶¶ 21-41; emphasis added). Defendants

8

respond that the LOI's language does not come into play, because it refers to a schedule 'to be provided," not the schedules that were *previously* provided on December 14, 2011. (Dfds' Br. Opp. Mot. Summ. J. at 2).

Finally, Defendants argue that they are entitled to summary judgment because Asta's fraud claims are barred by the "economic loss doctrine"[3] and by the LOI's merger or "Entire Agreement" clause, which nullifies prior representations. (Br. Supp. Dfds' Mot. Summ J. at 14-20, 20-24).

I find that there are significant outstanding issues of fact concerning Defendants' purported fraud. The falsity of statements is contested, as is Ms. Green's knowledge of any alleged falsity. Reliance is contested, because Asta's on-site representative is alleged to have been aware of the status of YWB's contract negotiations with third parties.

Judgment on the papers is not warranted in this complicated factual situation. I will deny both motions for summary judgment on the fraud count.

### E. Asta's Claims of (a) Breach of the Implied Duty of Good Faith and Fair Dealing, and (b) Conversion

Defendants seek summary judgment dismissing Count Two (breach of the implied duty of good faith and fair dealing) and Count Four (conversion) of the First Amended Complaint.

As to Count Two, the Greens cryptically argue that the claim is an attempt to evade the economic loss doctrine and the LOI's "entire agreement" clause. (Br. Supp. Dfds' Mot. Summ. J. at 36-37). These arguments, frankly, are not explained well enough to be considered. I see no basis to throw out the claim for breach of the implied covenant of good faith and fair dealing. In any event, it may depend on the existence and scope of the contract, issues as to which I have already denied summary judgment.

The Greens then argue that the conversion claim against them must be thrown out because they did not "wrongful[ly] exercise [] dominion and control over property owned by another in a manner inconsistent with the owner's rights." (*Id.* at 39-40). In their version, Asta willingly invested in YWB, which spent the money in accordance with the parties' intentions. Asta then pulled out of the funding deal, leaving YWB "holding the proverbial bag." (*See id.* at 39).

In response, Asta offers a one-liner: "Defendants are also liable for conversion because they obtained Asta's money through fraud." (Br. Opp. Dfds'

---

[3] Defendants argue that tort claims, including fraudulent inducement, are barred where the allegedly tortious actions are <u>not</u> extrinsic to the contract between the parties, but that here the allegations of fraud all concern matters directly tied to contractual performance. Regardless, I will permit it to be pled in the alternative, particularly where the contract issues cannot be resolved on summary judgment.

9

Mot. Summ. J. at 13-14). It is true that a claim of conversion may lie where money is obtained through fraud. *See* Restatement 2d of Torts, § 221(b); *see generally Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 461-62 (App. Div. 2009) (money can be converted), *cert. denied*, 200 N.J. 506 (2009).

For the reasons stated above, issues of false statement or fraud are factually contested. Because Plaintiff's fraud claim is not subject to dismissal on summary judgment, neither is this conversion claim.

### F. Defendants' Counterclaim Alleging Breach of Implied Duty of Good Faith and Fair Dealing

Asta argues that it is entitled to summary judgment on Defendants' counterclaim. (Br. Supp. Pltf's Mot. Summ. J. at 28-29). The Greens' counterclaim is based on alleged demands by Asta that YWB hire certain people, obtain office space, and make daily reports, demands that, according to Defendants, exceeded the bounds of the LOI. There are issues of fact surrounding, *e.g.*, Asta's motive in making these requests, the reasonableness of the requests, the scope of the contract, and many other matters.

Oddly, Defendants appear to argue in addition that they are entitled to recover the $40,000 that they returned to Asta when the relationship fell apart. This, they say, was based a mistake of law. No such cause of action is contained in their counterclaim. And if it were, it would rise or fall with the merits of Asta's case in chief, as to which I have already denied summary judgment.

As to the Counterclaim, too, summary judgment is denied

### CONCLUSION

For the reasons stated above, the Plaintiff's motion for partial summary judgment is **DENIED** and Defendants' motion for summary judgment is **DENIED**. An appropriate order follows.

_____
HON. KEVIN MCNULTY
United States District Judge

Dated: August 5, 2014
Newark, New Jersey